# ADA WELLMAN v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Division One, March 31, 1909.

1. **PREPONDERANCE OF EVIDENCE: Province of Appellate Court.** It is not in the province of the appellate court to weigh the evidence or to judge of the credibility of the witnesses; and although the evidence seems to preponderate in favor of appellant, the judgment will not be reversed on that account.

2. **NEGLIGENCE: Instruction: Uncertain.** An instruction which in a clear and concise manner tells the jury that if they find the facts therein stated to be true, as instruction numbered one for plaintiff in this case does, then they will find for plaintiff, is not misleading, uncertain or indefinite.

3. ————: ————: **Mere Abstraction.** An instruction, though it may be a statement of an abstract proposition of law, if it can not be seen how it worked prejudiciously to appellant, is not error.

4. ————: ————: **Other Injuries.** An instruction telling the jury to take into consideration "plaintiff's age and condition" at the time of the trial and the "physical injuries inflicted, if any," does not authorize them to award her damages for a diseased condition existing prior to the accident, especially when another instruction tells them not to allow her any sum for any injury "due to any other cause."

5. REMARKS OF COUNSEL. Where the court admonished respondent's counsel that his remarks concerning a witness whose absence was the basis of an application for a continuance and whose statement therein was read to the jury, were improper, and counsel withdrew them and asked the court to instruct the jury not to consider them, there is no warrant for reversal because of said improper remarks.

6. INSTRUCTION: Not Preserved. An instruction not preserved in the bill of exceptions cannot be considered on appeal.

7. EXCESSIVE VERDICT: $7,000. Where the evidence clearly establishes a condition and diseases prior to the accident similar to her present ones, and there is much evidence that plaintiff is simulating, and if so the conditions are such that the evidence of her injured condition rests largely in her own mind and are difficult of disproval, it becomes the duty of the court to scrutinize all phases of the case; and where such scrutiny discloses that the jury either misunderstood the evidence, or ignored it, or did not give effect to the greater weight thereof, and in consequence returned a verdict for an excessive amount, the court will correct the wrong. And in this case a verdict for $7,000 under the circumstances, is held to be excessive, and the judgment is reversed unless a *remittitur* for $3,500 is filed.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

AFFIRMED ON CONDITION.

*John H. Lucas* and *R. T. Railey & Son* for appellant.

(1) Assuming that plaintiff was entitled to recover under the evidence, yet the amount returned by the jury is so outrageously excessive, unjust and oppressive as to shock the conscience of any reasonable person, and must have been brought about by passion or prejudice or a misunderstanding of the legal effect of the testimony on the part of the jury in respect to plaintiff's alleged injuries. There was no legal evidence adduced at the trial which either proved or tended to prove the plaintiff's condition, after the alleged accident, in relation to her womb, ovaries, fallopian tubes and their surroundings, had

any connection with defendant's alleged negligence. On the contrary, in respect to the matters above mentioned, the verdict of the jury was based purely upon speculation and conjecture. The burden of proof devolved upon plaintiff to show to a reasonable degree of certainty that defendant's alleged negligence was the proximate cause of her alleged diseased condition in respect to her womb and its surroundings, and having failed to do so, she has recovered in this case about ninety-five per cent of her damages purely upon speculation and conjecture, and without any legal evidence on which to base the same. A verdict thus returned cannot stand the test of judicial criticism. Garard v. C. & C. Co., 207 Mo. 256; Reynolds v. Railroad, 189 Mo. 421; Chilton v. St. Joseph, 143 Mo. 199; Russell v. Columbia, 74 Mo. 488; Albin v. Railroad, 103 Mo. App. 318; Schwend v. Railroad, 105 Mo. App. 534; Walker v. Railroad, 106 Mo. App. 326; Wilbur v. Railroad, 110 Mo. App. 698; Ballard v. Kansas City, 110 Mo. App. 398; Haas v. Railroad, 111 Mo. App. 716; Ford v. Des Moines, 106 Iowa 94; Hardy v. Railroad, 89 Wis. 183; Strohm v. Railroad, 96 N. Y. 306. (2) When the jury retired to consider the case, there was before the mind of each juror a cleancut statement from Mr. Boyle to the effect that Sullivan's evidence was a myth, and in his opinion there was no such witness, as he had never seen him or had the opportunity of cross-examining him. Would the average juror, who had a high appreciation of plaintiff's counsel, have ignored the language used in determining what weight to give Sullivan's testimony? We think it too clear for argument that by reason of Mr. Boyle's statements the jury was so prejudiced as not to have considered the testimony of witness Sullivan, or it could not have returned a verdict for plaintiff on the merits of the controversy. The evidence of Sullivan was not only material, but directly corroborated the conductor in regard to the main facts

in the case. The only way to require counsel to keep within the record, and not derive an unfair advantage in a case of this character by the foregoing conduct, is to remand the cause for a new trial. Smith v. Tel. Co., 55 Mo. App. 635; Enser v. Smith, 57 Mo. App. 596; Boggess v. Railroad, 118 Mo. 338; 1 Thompson on Trials, secs. 264, 266; Stratton v. Nye, 63 N. W. 928; Andrews v. Railroad, 71 N. W. 377; A. L. & L. S. Co. v. May, 71 N. W. 69; Sutton v. Railroad, 73 N. W. 995; Railroad v. Kellogg, 76 N. W. 464; Rudiger v. Railroad, 77 N. W. 171; Taylor v. Railroad, 79 N. W. 18; Hennies v. Vogel, 87 Ill. 242; Magoon v. Henniker, 41 N. H. 317; Tucker v. Henniker, 41 N. H. 317; Martin v. State, 63 Miss. 505; Rudolph v. Landerlien, 92 Ind. 34; Perkins v. Burley, 15 Atl. 21.

*Guthrie & Smith, Boyle & Howell* and *J. K. Stickney* for respondent.

(1) Plaintiff's evidence shows that the verdict in this case was not excessive; and defendant has waived any right to complain that the verdict was based on an issue not sufficiently established by the evidence. (a) There was substantial evidence that plaintiff's condition was the result of defendant's negligence. In considering this issue, the question before this court is not whether the defendant offered evidence which might have tended to overcome in whole or in part the effect of plaintiff's evidence, but the question is whether the plaintiff has made a substantial showing that her condition at the time of the trial was the result of the injuries which she received because of defendant's negligence. Alabama, etc., Co. v. Hill, 93 Ala. 518; Armstrong v. Town of Ackley, 71 Iowa 79; King v. City of Oshkosh, 75 Wis. 520; Stephenson v. Flagg, 41 Neb. 373; Stein v. Kaster, 67 N. J. L. 481; Lindeman v. Brooklyn, etc., Co., 69 App. Div.

(N. Y.) 442; Field v. N. Y., etc., Co., 109 App. Div. (N. Y.) 831; Glasgow v. Railroad, 191 Mo. 363; Sharp v. Kansas City, 114 Mo. 100; Hanlon v. Railroad, 104 Mo. 391; McRae v. Railroad, 125 Mo. App. 562.   (b) But the question of whether or not there was a sufficient showing that plaintiff's condition was the result of defendant's negligence is not properly reviewable in this court.  Defendant raised no objection in the trial court to the sufficiency of plaintiff's evidence on this issue.  When plaintiff attempted to show that defendant's negligence was the cause of plaintiff's injuries, defendant objected to this proof on the ground that it was a question for the jury.  It made no motion to strike out any of plaintiff's evidence; it asked no instructions withdrawing this issue from the jury; on the contrary, it asked and the court gave an instruction submitting to the jury the converse of this issue.  Frankenthal v. Assurance Co., 76 Mo. App. 15; Kenefick v. Society, 205 Mo. 311; Matonsek v. Catholic Union, 192 Mo. 596; Englehart, etc., Co. v. Burrell, 66 Mo. App. 122.  (2) The alleged misconduct in argument by plaintiff's counsel is not shown by the record; and on the showing made by the affidavits it was harmless, and was withdrawn.  (a) Before an appellant can present such a question to an appellate court, it must have objected and excepted to such an argument, and to any adverse rulings on the part of the court, and it must have preserved the same in its bill of exceptions; and this was not done in this case.  It is not sufficient for it to attempt to do so by affidavits filed in support of a motion for a new trial, and including these affidavits in its bill of exceptions.  (b) Such a comment would be harmless. (c) It appears to have been immediately retracted, apologized for and reprimanded.  (d) No further objection was offered, no request was made for the discharge of the jury and no criticism was raised as to

the sufficiency of the reprimand.  (e) The trial judge in his discretion refused to grant a new trial.

WOODSON, J.—This suit was begun in the circuit court of Jackson county by the plaintiff against the defendant, to recover the sum of $15,000 damages for alleged injuries received by her, caused through the alleged negligence of defendant by prematurely starting one of its cars while she was in the act of boarding the same for the purpose of becoming a passenger thereon.  The trial resulted in a verdict and judgment for the plaintiff in the sum of $7,000.  From that judgment defendant duly appealed to this court.

The petition, upon which the case was tried, omitting formal parts, reads as follows:

''Plaintiff for her cause of action against defendant says that now and at all of the times hereinafter mentioned defendant was a corporation duly organized and existing according to law and engaged as a common carrier of passengers for hire, operating lines of street railway in and upon the streets of Kansas City, Missouri, and vicinity.  Among its said lines is and was at all of the times herein referred to a line called the Vine Street line, running upon Woodland avenue from a point north of Thirty-ninth street to Forty-third street, all being public streets in Kansas City, Missouri.  On October 30, 1904, plaintiff attempted to board one of defendant's south-bound cars on said Vine Street line at Thirty-ninth street and Woodland avenue for the purpose of taking passage thereon, said car being stopped at that point for the purpose of receiving and discharging passengers. While plaintiff was in the act of getting upon said car, and while she was in a position of peril, all of which was known or by the exercise of due care should have been known to defendant, defendant negligently started said car, and plaintiff was, by the negligent starting of said car, and by the negligent act of defend-

ant's conductor in trying to catch plaintiff as the re-
sult of said negligent starting of said car, thrown
against parts of said car, and to the ground, and great-
ly injured.

"As the result of said negligence plaintiff re-
ceived a severe shock to her nerves and nervous sys-
tem, her legs were bruised, cut and injured from below
her knees to her ankles; her back and shoulders were
bruised, sprained and injured; her left side was
bruised and injured, there was a rupture or break-
ing of some part of the abdominal wall, and she re-
ceived severe internal injuries, particularly in the pel-
vic region, causing her to have peritonitis, and caus-
ing an adhesion of parts of her uterus, ovaries and
fallopian tubes to each other and to the bowels and
pelvic and abdominal walls; causing the ovaries to
be enlarged and made sore, producing abscesses there-
in and about the fallopian tubes; causing prolapsus
and retroflection of the uterus; causing her pains in
said affected parts, and in her head, back, shoulder
and legs. Said injuries are permanent, and plaintiff
has suffered and will continue to suffer therefrom
great bodily pain and mental anguish. By reason of
said injuries plaintiff has been rendered an invalid,
and she will continue to be such as long as she lives,
her ability to bear children has been destroyed, and
her period of life has been greatly shortened. Plain-
tiff has been confined to her bed and will be further
confined to her bed as the result of said injuries. When
plaintiff is able to get about she is only able to do so
with great difficulty, and she has to limp, as the result
of her injuries. As the result of said injuries plain-
tiff has become and will continue to be afflicted with
leucorrhoea. Plaintiff says that by reason of said in-
juries she has been damaged in the sum of fifteen thou-
sand dollars.

"Wherefore, plaintiff prays judgment against

said defendant for said sum of fifteen thousand dollars and costs of suit.''

The answer contains a general denial and a plea of contributory negligence.

Plaintiff's evidence tended to show that on October 30, 1904, defendant was operating a street railway system in Kansas City, Missouri; among its lines was the Vine Street electric line, which in a part of its course ran north and south along Woodland avenue from a point north of 33rd street to 43rd street on the south. The numbered streets in Kansas City run east and west. Woodland avenue runs north and south. On the day in question plaintiff attempted to take passage on a southbound car at 39th street. She had stood near the usual stopping place at the intersection of said streets while the car was approaching from about 33rd street and until it reached 39th street. As the car reached 39th street it stopped and discharged several passengers. The car was stopped so that the front end was even with the plaintiff. It was necessary for her to go to the rear of the car to get upon the same. Up to this point the testimony of the plaintiff and defendant is substantially the same. There were only four witnesses who testified with reference to the accident, three of whom claimed to have seen the accident. The plaintiff was the only witness on her own behalf on this issue. The plaintiff testified that as soon as the car came to a stop, she immediately started to the rear and reached there before the last passenger had alighted and while the car was still standing she attempted to get upon it, the car started, and she was thrown off of her balance; the conductor attempted to catch her, and in so doing jerked her toward him to keep her from falling. As the result of the starting of the car and this act of the conductor, she was thrown against parts of the car and to the ground, causing her to be bruised about her shoulder and hip, producing sharp, cutting pain in the

left side of her abdomen, scraping her legs, and causing her to fall in a heap.

Plaintiff also introduced evidence tending to prove the allegations of the petition regarding the injuries she sustained in consequence of the accident, and that they were of a serious character.

''Q. Now, did you ever have any sickness prior to the troubles that you now complain of? A. Yes. Q. Were you ever in the hospital? A. Yes, sir. Q. What hospital? A. The Women's and Children's Hospital. Q. When was that? A. That was in 1903, I think in July of 1903. Q. What was the trouble then; tell the jury what the difficulty was? A. Well, at the birth of one of my children I had received a laceration and I had gone there to have that repaired. Q. You went there to have it— A. Have it repaired. Q. Have it treated? A. Have some stitches taken. Q. Was that the result of the birth of your second or third child or the first child? A. The first child. Q. These lacerations had remained there for a number of years, then? A. Yes, sir. Q. What year had your second and third child—were they dead at that time? A. Yes, sir. Q. How? A. Yes, sir. Q. When did you have the third birth? A. I believe in the summer of 1903—02. Q. 1902? A. Yes, sir. Q. Had you convalesced and gotten up from the sickness of that? A. Yes, sir. Q. Did the child die in childbirth? A. No, sir. Q. What was the trouble with the child? A. Negligence on the part of the nurse. Q. How old was it when it died? A. About six weeks old. Q. Did any complication set in in reference to the birth of that child? A. No, sir. Q. Who was the doctor that took that child from you? A. Dr. J. E. Donaldson. Q. Now, on the following July, as I understand you, you went to the Women's and Children's Hospital? A. Yes, sir. Q. And was there operated on for a lacerated womb trouble? A. Yes, sir. Q. How long were you in the hospital? A. I think about three weeks. Q. Then

did you return to your home? A. Yes, sir. Q. What was the condition of your health and your general condition after you got out of the hospital and had convalesced from the operation that you had gone through? A. Why, I was well. Q. Did you work after that? Did you get out and sew, do your household work? A. Yes, sir. Q. Did you have any servants to assist you in your household duties? A. No, sir. Q. You then had one child? A. Yes, sir. Q. Your family consisted of your husband, your child and yourself? A. Yes, sir. Q. Did you have any trouble—any trouble with your ovaries or anything of that kind during any of your life up to the time that that condition developed after this accident? A. No, sir."

To maintain the issues upon its part, defendant offered the following witnesses whose testimony follows their respective names:

Emil Duffen testified that he was the conductor in charge of defendant's car at the time and place of alleged injury to plaintiff, and was working as an extra man on said date. He worked on other lines as well as on the one where the accident occurred. His number on the day of accident was 722, and the name of his motorman was George Butler. The day of alleged accident was Sunday, October 30, 1904. He said they stopped at the junction of Thirty-ninth and Woodland avenue, to let off some women and children as passengers. . . . .

"Q. After these women and children that you speak of had gotten off the car, what, if anything, did you do towards starting the car up? A. Why, when they got off I gave the motorman two bells to go ahead. Q. At the time you gave the motorman two bells to go ahead, state whether or not there was any one there at the steps of the car in sight, standing there to get on the car? A. No, sir. I saw no one. Q. Now, after starting your car up, did you see anyone there? A. Why, just as I started, the car started; yes, sir. Q. Who did

you see there then? A. Why, a lady. Q. What, if anything, did she do? A. Why, she came rushing towards the car as if she wanted to get on. Q. What did you do then? A. I drew up and gave the motorman a bell to stop. Q. And what did she do, if anything, before the car stopped? A. Why, as well as I can recollect, she grabbed hold of the rear end of the car like and kind of walked a step or two along with the car as it moved. Q. After you started up the car, did it afterwards come to a stop? A. Yes, sir. Q. How far did it run from the time, about how far did it run from the time that you started the car up until— A. About five or six feet, I should judge. Q. Then what happened? A. Why, the motorman stopped and this lady got on the car and rode out to the end of the line. Q. Now, I will ask you while your car was stopped there, before you had started up at all, if this lady was standing there close to the step and stepped up on to the step with one foot, and then the car started up, and you tried to catch her and pull her on to the car, but that she fell down and off, and fell down or sat down or squatted down there in the street? A. No, sir. Q. Now, after she got on the car and you started up the car then, and went on out to the end of the line, do you know where she got off? A. Why, she got off at the end of the line. Q. I will ask you if at any time on the car she complained to you of being hurt in any way? A. No, sir. Q. Did you take her name at the time? A. No, sir. Q. I will ask you if you remember what part of the car she sat in after getting in the car? A. Why, she sat in the rear end, I think. Q. And when she got off of the car, which way did she go in getting off of the car? A. She went to the front end to get off, the south end there then. Q. What, if any, complaint did she make to you on the car? A. No, sir; she did not make any complaint. Q. State whether or not she complained to you about being hurt by your car starting up too quick? A. No, sir.''

CROSS-EXAMINATION: Witness did not have a personal recollection as to which side of the street his car stopped on at time of accident.

"Q. You don't remember now which side it stopped on, do you? A. No, sir; I do not. Q. Very well. Now, you say that this lady came rushing towards you from the front end of the car? A. Yes, sir. Q. Now, in order that I may get the matter straight in my own mind so we'll all understand it, you were looking south; you must have been looking south? A. Yes, sir. Q. To see her coming from the south, she was coming from a southerly direction, was she not? A. Yes, sir. Q. Was she on the sidewalk or on the street? A. Why, she was on the street. Q. Your car was going south? A. Yes, sir. Q. How far was she from your car, I mean now west of your car; she was on the west side of your car, wasn't she? A. Yes, sir. Q. How far west? A. Why, I couldn't say; it seemed to me like she was as near up as she could get to the car. Q. To the car? A. Yes, sir. Q. You could see her running towards you from the pavement, if you were on the back vestibule of the car, and she was coming along the car in this way (indicating) and you were back here, how could you see her unless you looked out this way (indicating); you must have looked out to see if all the passengers were on; isn't that a fact? A. Yes, sir; I looked outside. Q. That is the usual method, isn't it? A. Yes, sir. Q. And you do that before you start your car, don't you? A. Yes, sir. Q. Now, if you looked out and saw this woman coming before you started your car, why did you start your car? A. Why, when the passengers got off I looked right out in the street, and there was no one there to get on at the usual place where passengers stand when they want to get on, there was no one there to get on. Q. That is your answer, is it? A. Yes, sir; when I looked out and the car started there was no one there to get on . . .

"Q. And you helped the passenger get on the car? A. Yes, sir. Q. She made no complaint to you? A. No, sir. Q. It is an incident that occurs almost daily in the operation of this system, isn't it? A. Yes, sir. Q. You don't report those things, do you? A. Why, if they make any complaints, sometimes we do. Q. She had not made any complaint about it; you say she did not talk to you? A. No; no, sir. Q. Then, what were you reporting about, now, just tell us? A. Why, I was called down to the claim department. They asked me to make out a report. Q. Of what? A. Well, after I was subpoenaed about this matter here, this incident which occurred up there. Q. After you were subpoenaed to take your deposition did you then make that report, or before it? A. After."

George G. Butler testified that he was the motorman in charge of car at the time of alleged accident. He said plaintiff got on his car on Sunday, October 30, 1904, at Thirty-ninth and Woodland avenue, and that the car was going south. It was about 11 o'clock in the forenoon. He said they stopped on the north side of Thirty-ninth street with the rear end of the car.

"Q. When your car stopped there did you see the plaintiff in this case; did you see her when the car stopped, or soon after it stopped? A. Yes, sir; when the car stopped, I noticed a lady standing just at the front end of the car like. Q. How was your car arranged with reference to the entrance to the vestibule from the street, the front end of it, at that time; could a person get in from the west side? A. No, sir. Q. The entrance was on the east side of the car? A. Yes, sir. Q. At the front end? A. Yes, sir. Q. Now, do you know how you came to start your car up when you did from that point? A. I got a signal from the conductor; got two bells to go ahead. Q. And did you start your car up then? A. Yes, sir. Q. Did you afterwards receive any further signal? A. Yes, sir; just after I started the car I got

a signal to stop, and the car had probably gone three or four, five feet. Q. What did you do then with reference to stopping, after you started? A. I stopped the car immediately as soon as I got the signal. Q. How far did your car run altogether from the time it started up till it stopped? A. Oh, from three to five feet; not over four or five feet—just started. Q. Now, after seeing this lady at the front end of the car, when did you see her next? A. I noticed her when I got to the end of the line—Forty-third street. Q. I am not speaking about after starting up —after you stopped your car, didn't you? A. Yes, sir. Q. Well, what did you do then, after you stopped the car? A. Well, I noticed—I just looked around to see what was wrong, and she was getting up the steps into the vestibule, in the rear vestibule. Q. Now, when you got this signal to stop, did you see anybody else or get any signal from anybody else at that time? A. There was a man standing about 15 feet in front of the car, right at the edge of the sidewalk, right at the edge of where the curbing is, and he throwed up his hand and I stopped my car and looked around then to see what was the matter. Q. Who was that man? A. His name was Sullivan. Q. Do you remember his first name? A. Charlie, I think, is his name. Q. Now, after you saw that, you looked around then, and where do you say that she was then? A. She was just getting up, coming up the steps into the vestibule when I looked around. Q. How soon did you look after you got your car to a stop? A. Just as soon as the car stopped I looked around to see what the trouble was, if there was any. Q. State whether or not there was any other passengers on the car at that time? A. There was no one in the car at the time; no, sir; no passengers. Q. State whether or not from there to the end of the line anybody got on or off the car? A. There was no one got off the car or on the car. Q. State whether or not you made any stops from there

to the end of the line? A. No, sir; did not make any stops. Q. Now, when you got to the end of the line, or while you were going to the end of the line, did you notice where this lady was in the car, what part of the car she sat in? A. Not till after I got to the end of the line and started back through the car. Q. Now, what did you do, what did you do after you got to the end of the line and after stopping your car, what was the next thing that you did? A. Why, I took the controller handles and the air lever off and started—and the sand punches, and started back to the rear end of the car with them, to change ends. Q. And did you see the plaintiff then? A. Yes, sir; after I got out in the car I noticed her. Q. Where was she then? A. She was sitting on the short horizontal seat in the rear end of the car, and just after I got up in the car she got out. Q. What, if anything, was said as you went through the car? A. Well, she turned around to the conductor and was saying something to him; I could not hear what she said, and I got up pretty close to her, and she turned around to me and said, I think that she said, 'You saw me,' or something, and I told her if she wanted to chew the rag she would have to hunt some person else. I saw that she was angry and it was too pretty a morning to fuss with anybody. Q. Now, which end of the car then did she go to, after she went from that place where did she go to? A. She went to the south end of the car, what had been the front end of the car. Q. Did she get off then or did she remain there, or what did she do? A. No, sir; I went on out into the vestibule about my work, and she went to the south end of the car, and then came back to the north end of the car, and looked at my badge number, and then she started back through the car again, and got off at the south end of the car. Q. Now, when she got off the—or when she turned to the south end of the car the first time or the second time, state whether or not on either occasion you followed her to the south end of

the car? A. No, sir; I was attending to my work in the vestibule, in the north vestibule. Q. I will ask you if at any time, either in the car or in the vestibule, or anywhere there in the car, you made such motions with your foot as though you 'were going to kick her? A. No, sir.''

On cross-examination witness testified as follows:

''Q. You saw the woman standing there, did you, as you came up to Thirty-ninth street? A. Yes, sir; I noticed her standing there as I came up, as the car stopped. Q. She had the appearance of a person who wanted to take your car, did she? A. No, sir; I did not; never thought of anything of that kind. Q. Why didn't you, what was there about her attitude of standing there waiting for the car on the west side of the street, which would be the natural side, why weren't you aware of the fact that she wanted to take your car; what was she doing that made you think she did not want to take it? A. Well, I was not paying much attention to her, and I had a bell to stop at Thirty-ninth street, and I stopped at the regular place, and I was not paying much attention to her, and I noticed her standing there as the car stopped. Q. Well, and as the car stopped you saw her start for the other end, didn't you? A. No, sir. Q. Well, she did go toward the south end, didn't she? A. No, sir; not that I know of; she was standing at the south end of the car at the time. Q. Well, what did she do when your car stopped? A. She just stepped back and went toward the north end of the car. Q. How did she go toward the north end of the car. I got confused myself in the directions? A. Yes, sir; that is what I thought. No, she just stepped back; I didn't pay any attention to her; she just stepped back and started north. Q. Started north? A. Yes, sir. Q. Well, that was toward the place— A. Where she would get on, yes, sir. Q. Get on? A. Yes, sir. Q. Well, she acted then as though she was about to take the car, didn't she? A.

She didn't give me any idea that she wanted the car. I didn't know whether she wanted to cross the street behind the car or what. I didn't know what her intentions were. Q. You don't know whether she wanted to cross the street? A. Yes, sir; I didn't know her and didn't know that she wanted the car, no, sir.''

Witness said there was nothing that attracted his attention at the time of the alleged accident.

''Q. You carried thousands of people? A. Yes, sir. Q. Very well; now you say just as the car came to a stop you saw her getting on your car; you looked back and saw her getting on? A. No, sir. Q. Then I misunderstood your testimony. I thought you said that as you came to a stop you looked back and you saw the woman getting on the platform? A. No, I said she was at the front end of the car. Q. I mean afterwards, after you had gone four or five feet and got another bell. Now you stopped at Thirty-ninth street. Then you started up, and here Sullivan gives you the signal to stop, something wrong, this man standing on the side of the street, you get a bell from the conductor to stop; you stopped, didn't you? A. I stopped when I got a bell. Q. And you looked back, didn't you? A. Yes, sir. Q. Then you saw her getting on the platform, didn't you? A. No, sir, I saw her getting on the steps. Q. On the steps, just as soon as you stopped? A. Yes, sir. Q. Very well. So we get along that far, so there wasn't anything in that incident that attracted your attention very much, was there? A. No, sir.''

Witness said he knew Sullivan, who had been formerly in the employ of defendant. He had formerly been a conductor on defendant's road.

Defendant filed an application for a continuance of the cause because of the absence of Charles Sullivan, one of its witnesses, and stated therein what he would testify to if present.

Upon the election of counsel for plaintiff that

Sullivan's testimony might be read to the jury, the court overruled the application for a continuance.

Sullivan's testimony was as follows:

"Q. Mr. Sullivan, I wish you would state what you know in regard to this trouble? A. I was standing on the corner of Thirty-ninth and Woodland in front of a little grocery store; I was waiting for a car to take me to town; while I was standing there a car came from the north and stopped; several passengers got off and the conductor then gave two bells to go ahead; about this time a woman who was standing somewhere near the center of the car on the ground started toward the rear end and took hold of the hand-hold of the car and attempted to board it; the conductor warned her and at the same time rang the bell for the car to stop; the car came to a stop and the conductor assisted her on and he then went on; the lady acted and looked very mad. Q. I will get you to state if she fell down? A. No, sir; she did not. Q. Do you know who this lady was? A. Some one in the grocery store said her name was Mrs. Wellman."

This was all the testimony in respect to what occurred at the time and place of alleged accident.

Defendant also introduced several witnesses whose testimony tended to show that plaintiff was sickly and diseased at the time of and prior to the time of her alleged injury; and among others were Dr. G. H. Donaldson and his son Dr. J. E. Donaldson. The former testified as follows:

"Q. I will ask you if you were at any time called in consultation with your son, J. E., to see Mrs. Wellman, the plaintiff in this case? A. I was. He asked me to go with him. Q. When was that, Doctor? A. I think that was about in May, as well as I can remember, about 1903 I guess. Q. What condition was she in at that time? A. She was in a very nervous neurotic condition. Q. Was she in bed or where? A. She was in the bed. Q. What examination did you make of

her, Doctor, at that time? A. I made just a physical examination. I did not make any digital examination of the uterine appendages or anything of that kind, but just over the abdomen, the general pulse and tongue and in a general way. Q. What was the seat of her troubles at that time? A. Seemed to be in the uterine appendages, the ovary or uterus and so on. Q. When, if at any time, did you see her after that? A. Never saw her except at the hospital the day she was operated on. Q. Did you then make an examination or see her condition? A. Yes, sir. Q. What was her condition then? A. She had a lacerated cervix and also peritoneum and a congested, large congested flabby womb. Q. What was its position, Doctor? A. It was prolapsed, it was prolapsed. Q. What do you mean by that? A. That in common parlance would be falling of the womb; done that on account of its heft, you know, dragging it down. Q. Was it out of position at that time; could you tell in any other respect whether it was retroverted or not? A. I do not recall of retroversion or anteversion or anything of the kind; I do not recall anything. Q. But it was large and flabby? A. Yes, sir. Q. And you say congested. What do you mean, Doctor, by that? A. Why, it was large and full of blood and made it heavy, you know, so that when she got on her feet it dragged down and pulled. Q. You speak about the cervix being lacerated; is that the mouth of the womb? A. Yes, sir; that is the neck of the womb; cervix would be the neck. Q. And what, if any, effect does that have on a person? A. Oh, it makes them nervous and in a general way it breaks them down, becomes physically dilapidated and exhausted. Q. What was her general physical condition at that time, Doctor? A. She was in—she was a wreck. Q. She was a wreck? A. Yes, sir. Q. Now you speak about something else being torn there, Doctor? A. The peritoneum, that is, to make it plain, the section from the vagina down towards the anus, and

that part of the integument there between, lacerated, torn down there, that is what we call the peritoneum, that was lacerated. Q. And that part of the neck of the womb being lacerated, how could that be caused, Doctor? A. Why, I presume it would be caused by delivering of child and confinement.''

On cross-examination witness said plaintiff, on account of giving birth to children, etc., was not a very sturdy type of woman and would be more susceptible to injuries than a rugged person. He said the tear was an old one and may have been there five years. He said this frequently occurs in giving birth to children and when torn should be sewed up. He said complications follow that are sometimes very serious. He said the operation performed upon plaintiff was a successful one.

Dr. J. E. Donaldson testified that he saw plaintiff and treated her in May, 1903. He visited her frequently before the operation in 1903.

''Q. Now, what did you visit her and treat her for in May, 1903? A. Well, I think, as near as I can remember, at that time she was suffering from a nervous neurotic condition and which I believed was caused from the condition of her female genital organs. Q. Did you make an examination of her pelvic organs or any of them at that time? A. I don't know just exactly when it was. I examined her several times, I don't know whether just— Q. What was the condition as you found them? A. Well, she had a lacerated cervix, a tear on either side of the cervix, the mouth of the womb, and also a badly torn peritoneum. Q. Were there any effects from that, Doctor, which she appeared to be suffering-from? A. Why, I thought that that had a good deal to do with her nervous condition at that time, the reason I recommended her going to the hospital and having it repaired. Q. Was she at this

time that you saw her, in May, was she in bed or sitting up? A. She was in bed. Q. Were there sometimes, Doctor, there during that period that you visited her twice a day? A. I could not answer that now, I don't know. Q. You called your father, did you, in consultation at that time? A. Yes, sir. Q. Over her case? A. Yes, sir. Q. What was the matter with her then, from the 4th of August up to the time she went to the hospital? A. Why, she was in a very nervous neurotic condition and was suffering a good deal from pain and inflammatory condition of the female organs. Q. Where was the seat of all that trouble that she was suffering from at that time? A. I don't know what you are trying to get at. Q. Where was the suffering, if she suffered, where was the pain? A. Why, she had more or less pain and tenderness over the abdomen, over the genital organs."

He then advised her to go to the hospital.

"Q. Now, at the time the operation was performed, could you tell us what the condition of her genital organs was then? A. Well, there was a laceration, a tear on either side of the cervix or mouth of the womb, and there was also quite an extensive tear on the peritoneum, or the outside portion of the vagina, and left the female organs without their normal supports and with a constant irritation to the nervous system. Q. What was the position and condition of the womb— uterus? A. Well, naturally being irritated that way, it would be inflamed and congested. Q. Do you remember whether it was prolapsed or not? A. Yes, sir, there was some prolapsus all right. Q. Was there any tenderness about the abdomen and the parts? A. Yes, sir; there naturally would be when there is an inflammatory process going on."

On cross-examination witness said he thought it was best to have these tears sewed up as they tended to create a nervous condition and complication of all characters might result. He said it frequently hap-

pens to women who have children. He thought the operation at the hospital was a success. She was delivered of her last child in 1902.

At the close of plaintiff's case and again at the close of all of the testimony in the case, counsel for defendant asked an instruction in the nature of a demurrer to the evidence, both of which the court refused; and defendant duly excepted.

Thereupon counsel for plaintiff asked, and the court gave, in her behalf, the following instructions:

"1. The court instructs the jury that if you believe from the evidence that the defendant on October 30, 1904, was operating the car mentioned in the evidence, for the purpose of carrying passengers for hire, and that on said day it stopped said car at or near the corner of Thirty-ninth street and Woodland avenue, in Kansas City, Missouri, for the purpose of taking on or discharging passengers, and that while said car was so stopped plaintiff was standing at such stopping point, and thereupon immediately exercised reasonable expedition to get upon said car, and that while she was in the act of getting upon said car it was started forward by defendant before plaintiff could, by the exercise of reasonable expedition and reasonable care on her part, have gotten safely upon said car, and that the conductor of said car saw, or by the exercise of the highest practical degree of care ought to have seen, said plaintiff while she was attempting to get on said car (if she was), and if you further believe that by the starting of said car (if it was started) said plaintiff was thrown off her balance, and that defendant's conductor in charge of said car jerked plaintiff toward him on the car in attempting to keep her from falling to the ground (if she was), and that she was thereby caused to fall against parts of said car and to the ground; and if you further believe that prudent men engaged in the street railway business, in the exercise of the highest practicable degree of care, would not

have started said car forward under such circumstances, then the defendant was guilty of negligence, and if you believe that said plaintiff was, as the direct result of such negligence (if any) thrown against parts of said car and to the ground, and was thereby injured, then your finding should be for the plaintiff, provided you further believe that plaintiff was in the exercise of reasonable care at the time.

"2.    By the term reasonable care as used in these instructions is meant such care as would be used by an ordinarily prudent person under the same or similar circumstances.

"3.    It is the duty of a carrier of passengers to exercise the highest degree of care that can be reasonably expected of prudent men engaged in that line of business, to carry its passengers safely, and a failure on the part of such carrier to use such care is negligence on its part.    A passenger is required to use such care as would be used by an ordinarily prudent person under the same or similar circumstances, and the failure on the part of a passenger to use such care is negligence on his or her part.

"4.    If you find for the plaintiff, you will, in assessing her damages, take into consideration her age and condition, the physical injuries inflicted (if any), the bodily and mental pain suffered (if any), and any and all such damages (if any) of the kind and character mentioned, which will in the future reasonably result to her as the direct result of said injuries (if any) not to exceed in all the sum of fifteen thousand dollars.''

To which action of the court in giving said instructions, and each of them, defendant then and there at the time duly excepted.

At the request of the defendant the court instructed the jury as follows:

"3. The court instructs the jury that if you find and believe from the evidence that the whole or any part of the present physical condition of the plaintiff, com-

plained of in this case, is due to any other cause than being thrown or falling off of the car of defendant, then you are instructed that for such whole or part of such condition not due to or the result of being so thrown or falling from said car, she cannot recover for in this case.

"4. The court instructs the jury that if, after the car had started forward and while it was in motion, plaintiff attempted to get upon said car, and was injured thereby, she cannot recover in this case, and your verdict must be for the defendant.

"5. The court instructs the jury that the burden of proof is on the plaintiff to establish her case by the preponderance of the evidence, and by a preponderance of the evidence is meant the greater weight of the credible testimony.

"6. The court instructs the jury that the plaintiff is a competent witness in her own behalf, and you must consider her testimony in making up your verdict; but in determining what weight and value you will give her testimony, you may take into consideration with all the other facts and circumstances in evidence before you, the fact that she is the plaintiff testifying in her own behalf and her interest in the result of the suit. Whatever statements, if any, that she may have made against her own interest must be regarded as true, what she may say in her own favor is to be taken to be true or false when taken into consideration with all the other facts and circumstances detailed in evidence before you."

I. While counsel for appellant asked an instruction in the nature of a demurrer to respondent's evidence, and renewed that offer again at the close of all of the testimony in the case, both of which were by the court refused, yet that action of the court is not called to our attention for review, either in appellant's brief or argument; but notwithstanding that omission, we

have carefully read the entire evidence of the case,. as preserved in the record; and if it were within our province to weigh the evidence and to judge of the credibility of the witnesses from the face of this record, we would have no hesitancy in holding that it preponderates in favor of the appellant; but that is not within our province, nor have we the opportunity to see the witnesses who testified in the case, nor to observe their demeanor upon the witness stand and their manner of testifying as the jury and trial judge had, which placed them in a more favorable position to judge of the credibility of the witnesses and the weight to be given to their testimony than we have. [Brecker v. Fillingham, 209 Mo. 578.]

We are, therefore, of the opinion that there was no error on the part of the trial court in refusing to give the demurrers to the evidence.

II.   Counsel for appellant insists that the first instruction given by the court for respondent is erroneous, for the reason that it is misleading, indefinite and uncertain.

In our judgment that insistence is untenable. That instruction in a clear and concise manner tells the jury that if they find the facts therein stated to be true, then they would find for respondent. A similar instruction was approved by this court in the case of Devoy v. Railroad, 192 Mo. l. c. 206 and 207.

III.   Counsel for appellant contends that instruction numbered three given by the court on behalf of respondent is erroneous, in that it is simply a statement of an abstract proposition of law and failed to tell the jury what facts were necessary to constitute the plaintiff a passenger. While it is not good practice to give instructions to the jury which are legal abstractions, yet it has not been suggested in what possible manner the giving of that instruction could have worked in-

jury to appellant, nor have we been able to conceive any such. It was the duty of the jury to read all of the instructions given together, and when so read, and especially with instruction numbered one given for respondent, it cannot be seen in what possible manner it could have worked prejudicially to the rights of appellant. [Harrington v. City of Sedalia, 98 Mo. 583.]

We, therefore, hold there was no error in giving that instruction.

IV. It is also contended by counsel for appellant that instruction numbered four given on behalf of respondent, relating to the measure of damages, is erroneous for the reason assigned, that it authorizes the jury in assessing her damages to take into consideration her physical condition, which would include the prior diseased condition of her genital organs.

This instruction does not contain the vice suggested by counsel. It was clearly the duty of the jury in assessing respondent's damages to take into consideration "her age and condition" at the time of the trial, and "the physical injuries inflicted, if any," etc. And when that instruction is read in connection with number 1, given on behalf of appellant, which told the jury that they should not allow her any sum for any injury "due to any other cause than being thrown or falling off of the car of defendant," we are unable to see in what manner the jury could have allowed her for any of the prior injuries suggested by counsel for appellant.

V. It is next insisted that this judgment should be reversed because of improper remarks made by counsel for respondent in the argument of the case to the jury.

The record discloses that General Boyle, counsel for plaintiff, in making his closing address to the jury, took the application for a continuance made by defendant in this cause, which said application for con-

tinuance contained the statement of what Charlie Sullivan would testify to if he was present, and shook it in the face of the jury in a contemptuous, sneering manner and stated "this paper representative of Charles Sullivan which was filed in this case is an affidavit for continuance; who is this Charles Sullivan, who knows this Charles Sullivan, who is not here for cross-examination?" Whereupon, and upon the objections and exceptions of counsel for defendant to the said language of General Boyle, the court stopped him and admonished him that his language was improper.

There can be no doubt but what that language of General Boyle was improper, but this court would not be warranted in reversing this judgment upon that ground, especially since the record discloses the fact that the court stopped him and admonished him that his language was improper. In addition to that, General Boyle withdrew the statement and asked the court to instruct the jury not to consider it, which the court did.

Too frequently in the heat of argument before a jury improper remarks are indulged in by counsel on each side of the cause. Counsel should be more careful in that regard, and confine their remarks to the record, and refrain from improper argument.

VI. Counsel for appellant contends that during the examination of Drs. Palmer and Hyde, on behalf of respondent, they were permitted, over his objection, "to express opinions as to the effect of the blows upon the abdomen without being confined to the case under consideration and without offering to connect the matter, by offering to show subsequently a state of facts to which such testimony could have applied."

That objection is without merit. The court, jury and counsel all understood and knew the witnesses were testifying regarding the case on trial, and none other, and that the blows had reference to those re-

ceived by respondent by being thrown against the end of the car by the conductor.

VII.  Appellant's counsel contends that the action of the court in giving the following instruction was improper and erroneous:

"If the injury may have resulted from one or two causes, for one of which and not the other, the defendant is liable, the plaintiff must show, with reasonable certainty, that the cause for which the defendant is liable produced the result, and if the evidence leaves it to conjecture, the plaintiff must fail in his action."

He states his objection thereto in the following language:

"Under the foregoing authorities, the above instruction numbered 4, given at the instance of plaintiff, not only failed to state the law properly, but turned the jury loose, and gave it a roving commission, to assess future damages, without any evidence on which to base it, as heretofore shown.  The verdict returned is conclusive evidence in support of the above contention."

There is evidently some mistake surrounding this contention.  We have searched this record in vain for that instruction.  If it was asked by counsel for either party, or if given by the court of its own motion, this record wholly fails to disclose that fact.  Not only that, but judging from the character of the instruction itself, as it appears upon its face, we are unable to comprehend why counsel for respondent should ask it on behalf of their client.  If it was asked at all, it is more probable that counsel for appellant asked it, and failed to preserve it in the record; but however that may be, it is useless to prosecute these surmises and probabilities further, for the reason that we have no authority to pass judgment upon the instruction, because it was not incorporated in the bill of exceptions.

VIII. The final insistence of counsel for appellant is that the verdict of the jury was excessive, and that the judgment should be reversed for that reason.

It is their contention that, assuming that the respondent was entitled to recover under the evidence, yet the amount of the verdict "is so outrageously excessive, unjust and oppressive as to shock the conscience of any reasonable person, and must have been brought about by passion, or prejudice or a misunderstanding of the legal effect of the testimony on the part of the jury in respect to plaintiff's alleged injuries."

No reasonable person can read this voluminous record without coming to the conclusion that prior to the date of the injuries complained of respondent had been sick and diseased, in and about the pelvic regions, involving the uterus, peritoneum, cervix and fallopian tubes, as well as their connecting parts. The evidence is also equally conclusive that the neurotic troubles she then suffered from were due to and directly traceable to that diseased condition of those parts of her person. It is true she testified that the operation performed upon her was successful, and that she had completely recovered from all of those previous troubles prior to the infliction of the injuries sued for. She also introduced other testimony in corroboration thereof, which tended to prove her recovery. But upon the other hand there was much convincing testimony introduced by appellant which was contradictory of her testimony in that regard, and which tended strongly to show that she had not fully recovered from her previous ailments at the time she claims she received the injuries complained of in this case. That conflicting testimony presented a question of fact for the jury's determination; yet when we consider the fact that the evidence of such injuries rests largely in the mind and conscience of the injured party, and the difficulty with which they may be disproved, under the most favorable

circumstances, if the party is simulating (of which there is much evidence in this record) it then becomes the duty of the courts to closely scrutinize all phases of such claims, and where the record discloses the fact that the jury misunderstood the evidence, or ignored the same, or did not give effect to the greater weight thereof, bearing upon a particular question, or returned a verdict for an excessive amount, then it becomes the plain duty of the court to step in and correct the wrong or injustice done thereby. And when we read this record and consider the cause of respondent's injury; the similarity of her former condition and troubles to her present condition and complaints, taken in connection with the size of the verdict, we are fully convinced that the verdict was excessive and out of proportion to the injuries she received. When we recall the manner of her injury, what caused it, the conductor pulling her against the end of the slowly moving car, which moved only four to six feet, and in her own language, "I just come down in a heap on my feet, just all in a bunch, so to speak," then, in our judgment, that alone would not have caused the serious injuries she claims to have received in consequence thereof, nor warrant a verdict for $7,000.

The judgment is excessive, and it will be reversed and the cause remanded without respondent will within ten days from and after this date enter a *remittitur* of $3,500 upon the judgment. If the *remittitur* is entered within that time, then the judgment will be affirmed.

All concur.